MEG/AS
F.#2017R01721

**18M709**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG CELLULAR TELEPHONE BEARING IMEI 352557073083464 IN THE CUSTODY OF THE FEDERAL BUREAU OF INVESTIGATION | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. _____ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, STEVEN SCHILIRO, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2009. I am currently assigned to the New York Metro Safe Street Gang Task Force, where I investigate gangs, narcotics trafficking, firearms trafficking, fraud and other offenses. These investigations are conducted both overtly and covertly. During my tenure with the FBI, I have participated in numerous investigations of gangs, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed

cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations

of those engaged in gang activities, (e) monitored wiretapped conversations and reviewed

line sheets prepared by wiretap monitors, and (f) reviewed material obtained pursuant to

search warrants, including the contents of electronic devices, electronic mail accounts and

social media accounts. Through my training, education and experience, I have become

familiar with the manner in which racketeering, drug distribution, gun trafficking and money

laundering schemes are carried out, and the efforts of persons involved in such activity to

avoid detection by law enforcement.

2.      This affidavit is intended to show only that there is sufficient probable cause

for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

3.      The property to be searched is a Samsung cellular telephone bearing

international mobile equipment identity ("IMEI") 352557073083464, hereinafter the

"Device." The Device has been in the custody of the FBI since it was seized on April 17,

2018. The Device is currently in the Eastern District of New York in the custody of the

undersigned, but it is generally maintained in storage at the FBI's New York Field Office

under item number 1B38 and barcode E6280286.

4.      The applied-for warrant would authorize the forensic examination of the

Device for the purpose of identifying electronically stored data particularly described in

Attachment B.

2

## PROBABLE CAUSE

5.     The Device came into the custody of the FBI on April 17, 2018, when Mario

Rabb, also known as "Boss" ("RABB"), the user of the Device, was arrested pursuant to a

warrant issued by the Honorable Ramon E. Reyes, Jr., Magistrate Judge for the Eastern

District of New York. RABB was arrested in his apartment in the Bronx. The Device was

located on a window sill in the living room of that apartment. The arrest warrant was

predicated on RABB's membership in a large-scale narcotics-trafficking conspiracy

operating in Brooklyn, the Bronx, and elsewhere. RABB is charged under criminal docket

18-185 (FB) with Conspiracy to Distribute and Possession with Intent to Distribute cocaine

base and heroin, in violation of Title 21, United States Code, Section 846 and

841(b)(1)(A)(iii).

6.     Prior to his arrest, RABB was the target of a long-term investigation

conducted by the FBI and the New York City Police Department ("NYPD") into drug-related

and other crimes committed by members of the Mac Baller Brims, a set of the Bloods street

gang in which RABB is a member. The investigation involved, among other investigative

techniques, the use of Court-authorized wiretaps, including one of the Device. The

Honorable George B. Daniels, U.S. District Court Judge for the Southern District of New

York, authorized the interception of wire and electronic communications over the Device on

February 9, 2018. On March 22, 2018, the Honorable Gregory H. Woods, U.S. District

3

Court Judge for the Southern District of New York, renewed authorization to intercept wire and electronic communications over the Device.[1]

7.     Communications intercepted between February 9 and April 17 pursuant to the court Orders described above demonstrate that RABB routinely used the Device to facilitate drug- and gang-related activity.  More generally, the investigation revealed that RABB sold heroin, cocaine and crack cocaine, and that he used a commercial establishment on Webster Avenue in the Bronx (the "Store") to conduct some of his drug-related activity.

8.     For example, on February 11, 2018, RABB received a call on the Device from Kevin St. Hill ("ST. HILL"), another member of the gang and the drug-trafficking conspiracy (session #774).  During the call, the two men discussed the status of various members of the Mac Baller Brims.  Specifically, RABB told ST. HILL that "Mitch" is a Hound now [i.e., a member of another set of the Bloods street gang] and doesn't hang out with Macs [i.e., Mac Baller Brims].  RABB continued to say that he doesn't know where "Mitch" is anymore, and that if they catch "Mitch," they are going to "violate him" (i.e., assault or kill him).  RABB further said that two of RABB's "drops" [i.e., lower-ranking Bloods gang members that RABB brought into the gang] had "crushed Mitch."  The nature of this conversation – and RABB's reference to his "drops" in particular – offers proof that RABB is a Mac Baller Brim.

---

[1] I am informed that the Device is the cellular telephone that was the subject of the wiretaps Orders described herein because on April 17, 2018, a member of law enforcement dialed the telephone number that was the subject of the wiretap Orders and the Device rang.

9.     On February 14, 2018 (session #2443), RABB used the Device to speak to a
man referred to as Keon Lewis, also known as "Keke" ("LEWIS"), another member of the
drug-trafficking conspiracy. During the conversation, LEWIS asked RABB, "you got drop .
. . some drop top?" to which RABB replied, "What the fuck is drop top, man?" LEWIS
responded, "some hard, man," and RABB replied, "yeah, I got some hard." I am aware that
"hard" is a commonly used slang term for crack cocaine, which is a rock-like substance.
LEWIS then told RABB that he would meet RABB shortly at Webster (presumably at the
Store) where RABB said that he was going.

10.     The following day, on February 15, 2018 (session #2564), Malcolm Hogue,
also known as "Roach" ("HOGUE"), another member of the drug-trafficking conspiracy,
called RABB on the Device and asked RABB, "yo, bro, can you snatch the sneaker for me
from, um, the side, and put it in the back?" RABB responded, "It's in the storage room. I'm
not responsible for no sneaker and putting it in the back . . . back where . . . behind where?"
HOGUE specified, "behind the counter, Brody," to which RABB agreed. I am aware that
"sneaker" is a commonly used code word for a firearm, and believe that HOGUE asked
RABB to hide a firearm behind the counter of the Store in this call. Based on the content of
this call, members of the investigative team alerted the NYPD to the possibility that a firearm
was in the Store. Members of the NYPD then began conducting surveillance of the Store.
RABB was alerted to their presence by HOGUE who called RABB on the Device (session
#2589) to say, "Yo, watch that Impala [i.e., suspected police vehicle], you heard? Shit keep
creeping. It drove by just now."

5

11.     Ten days before his arrest, on April 7, 2018, RABB used the Device to have

the following exchange with an unidentified person who used telephone number (347) 340-

3365:

| | |
|---|---|
| 3365 User: | I don't want to be in a back pause (13000) |
| RABB: | U NO HOW TO COOK IT (13002) |
| 3365 User: | My niggas do .. I can't lie I ain't no raekwan (13004) |
| 3365 User: | I will sell it like that what's the difference (13006) |

I am aware that the process by which powder cocaine is converted to crack cocaine is known

as "cooking" it and believe that in this exchange, RABB was inquiring about whether the

3365 User could "cook" the powder cocaine that RABB had in his possession into crack

cocaine ("U NO HOW TO COOK IT").

12.     The calls and text messages detailed herein are a small sampling of the drug-

and gang-related communications intercepted over the Device during the authorized

interception period. The Device is currently in the lawful possession of the FBI and has been

since it was seized incident to the arrest of RABB. Therefore, while the FBI might already

have all necessary authority to examine the Device, I seek this additional warrant out of an

abundance of caution to be certain that an examination of the Device will comply with the

Fourth Amendment and other applicable laws.

13.     The Device is currently in the Eastern District of New York in the custody of

the undersigned, but it is generally maintained in storage at the FBI's New York Field Office

under item number 1B38 and barcode E6280286. In my training and experience, I know that

the Device has been stored in a manner in which its contents are, to the extent material to this

6

investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

14.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

7

b.  Digital camera: A digital camera is a camera that records pictures as digital
picture files, rather than by using photographic film.  Digital cameras use a
variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or by
connecting the removable storage medium to a separate reader.  Removable
storage media include various types of flash memory cards or miniature hard
drives.  Most digital cameras also include a screen for viewing the stored
images.  This storage media can contain any digital data, including data
unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio,
video, or photographic files.  However, a portable media player can also store
other digital data.  Some portable media players can use removable storage
media.  Removable storage media include various types of flash memory cards
or miniature hard drives.  This removable storage media can also store any
digital data.  Depending on the model, a portable media player may have the
ability to store very large amounts of electronic data and may offer additional
features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display
its current location.  It often contains records the locations where it has been.
Some GPS navigation devices can give a user driving or walking directions to

8

another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also

9

include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers

10

have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

15.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

16.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

17.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as

11

direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

12

behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

18. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

19. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

20. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

13

Steven Schiliro
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 31,

The Hono
UNITED STATES MAGISTRATE JUDGE

14

## **ATTACHMENT A**

The property to be searched is a Samsung cellular telephone bearing international mobile equipment identity ("IMEI") 352557073083464, hereinafter the "Device." The Device has been in the custody of the FBI since it was seized on April 17, 2018. The Device is currently in the Eastern District of New York in the custody of the undersigned, but it is generally maintained in storage at the FBI's New York Field Office under item number 1B38 and barcode E6280286.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to

violations of including  racketeering and racketeering conspiracy, in violation of 18 U.S.C.

§§ 1962(c) and (d), and punishable under 18 U.S.C. § 1963, drug trafficking, in violation of

21 U.S.C. §§ 841, 843, and 846, and firearms-related offenses, in violation of 18 U.S.C. §§

922 and 924 and involve MARIO RABB, also known as "Boss," since January 2017,

including:

    a.  lists of customers and related identifying information;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and
        amounts of specific transactions;

    c.  any information related to sources of drugs (including names, addresses, phone
        numbers, or any other identifying information);

    d.  any information related to individuals who work with or for RABB to
        distribute drugs (including names, addresses, phone number, or any other
        identifying information);

    e.  all bank records, checks, credit card bills, account information, and other
        financial records;

    f.  evidence of the use, possession and/or sale of firearms;

    g.  any information demonstrating RABB's membership in the Bloods street
        gang, and the Mac Baller Brims; and

h.  any information related to other individuals who are members in the Bloods street gang, and the Mac Baller Brims (including names, addresses, phone number, or any other identifying information);

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2